IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

REBECCA LEE GRAHAM,

                    Plaintiff,

v.                                                    Case No.  1:09-cv-00260-MP-GRJ

MICHAEL J. ASTRUE
Commissioner of Social Security,

                    Defendant.

_____

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") denying her application for supplemental security income

(SSI).  (Doc. 1.)  The Commissioner has answered (Doc. 14) and both parties have filed

briefs outlining their respective positions.  (Docs. 18 & 22.)  For the reasons discussed

below, the Commissioner's decision is due to be **AFFIRMED.**

## I.  PROCEDURAL HISTORY

Plaintiff previously filed for Title XVI benefits in 1999 and 2000. (R. 300.)  The

1999 application was denied and the 2000 application was not pursued to a hearing.

(R. 300.)  On August 27, 2004, Plaintiff protectively filed the application for SSI that is

the subject of the appeal in this case claiming a disability onset date of August 27,

2004. (R. 101.)  The application was denied initially (R. 84.), and upon reconsideration.

(R. 79-82.)  Thereafter, Plaintiff timely pursued her administrative remedies available

before the Commissioner, and requested a hearing before an Administrative Law Judge

("ALJ").  (R. 73.)  After conducting a hearing on January 22, 2007, (R. 297-309.) the

ALJ issued a partially favorable decision to Plaintiff on September 13, 2007.  (R. 25-34.)

ALJ Walker found Plaintiff was not disabled prior to May 2, 2007, but became disabled

on that date and has continued to be disabled through the date of his decision. (R. 31.)

Plaintiff timely filed a request for review with the Appeals Council.  (R. 9-12.)  The

Appeals Council denied Plaintiff's request for review.  (R. 5-7.)  On December 21, 2009,

Plaintiff filed the instant appeal to this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more

than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[3] The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the decision.[4]

---

[1] <u>See</u> 42 U.S.C. § 405(g) (2000).

[2] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] <u>Foote</u>, 67 F.3d at 1560; *accord,* <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); <u>Parker v. Bowen</u>, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, he is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[11] Fourth, if a claimant's impairments do not prevent him from doing past

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

relevant work, he is not disabled.[12]  Fifth, if a claimant's impairments (considering his

residual functional capacity ("RFC"), age, education, and past work) prevent him from

doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant

work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the

Commissioner to demonstrate that "other work" which the claimant can perform

currently exists in the national economy.[15]  The Commissioner may satisfy this burden

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive

determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant

has a non-exertional impairment which significantly limits his or her basic work skills or

when the claimant cannot perform a full range of employment at the appropriate level of

exertion."[17]  In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996); see Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## III. SUMMARY OF THE RECORD EVIDENCE

### A. Personal and Occupational Background

Plaintiff,  born August 14, 1963, (R. 101) was forty-four years old on the date of the ALJ's decision.  (R. 31.)   Plaintiff completed twelfth grade (R. 311.) and has past work experience as a cashier (R. 114), grocery bagger (R. 114), cosmetologist (R. 114, 311),  waitress (R. 95, 114), and certified nursing assistant. (R. 114, 315.)

Plaintiff claimed disability due to: severe pain in her neck, both shoulders, upper arms, lower back, and legs; severe migraine headaches; left hand numbness; depression and anxiety. (R. 111-12, 233, 253, 319, 320, 325-26, 335-36, 337-39.) Plaintiff states she has pain in these areas whenever she does anything physical. (R. 110.) According to Plaintiff, her pain is relieved when she rests or takes pain

---

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] See id.

medication. (R. 233, 253.)  Plaintiff's pain is alleged to contribute to her mental difficulties. (R. 337-41.)

Plaintiff was taking Tylenol 3, in October 2004, for her severe headaches, but she stated this medication was ineffective. (R.110-11.)  At the hearing, Plaintiff testified that she now takes Excedrin for her severe migraines. (R. 319.)  Plaintiff has a TENS unit, a neck brace she wears occasionally, a heating pad, and she meditates.  (R. 111, 323, 324.)  During 2005 and 2006, Plaintiff was prescribed Hydrocodone, Naproxen, Methocarbamol, Pitroxicam, Tramadol, Percocet, and Ultram.  (R. 151, 153, 155, 156, 157, 158, 159, 160-61, 233, 244, 255.)  Plaintiff no longer has Medicaid (R. 301-03, 310-11, 333) and no longer takes pain medication because she ran out of the medications. (R.  338.)  At the hearing, Plaintiff testified that most of her pain was in her neck, but that she was not currently taking anything for this pain.  (R.  323.)

## B. ALJ Findings

The ALJ found Plaintiff disabled beginning May 2, 2007, but not earlier.  He found Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible prior to May 2, 2007, because those statements were not supported by the objective findings of Drs. Nazario and Chodosh or the record as a whole.[21] (R. 30.)  However, the ALJ found Plaintiff's allegations

---

[21] Dr. Nazario performed a consultative psychological exam on Ms. Graham on November 9, 2004.  In his report Dr. Nazario states, "Diagnosis.  None.  Ms. Graham does not report nor manifest any symptoms of a psychological/emotional disorder at present...She appears able to concentrate, able to understand, and follow directions.  She appears able to interact with others appropriately." (R. 167.) Dr. Chodosh performed a consultative physical exam on Ms. Graham on November 10, 2004.  His impression of Ms. Graham's pain was that it was chronic and of an uncertain etiology.  He noted "[t]here are no significant abnormalities or signs of impairment on physical examination." (R. 171.)  Based on the objective evidence, Dr. Chodosh was of the opinion that Ms. Graham could see, hear, speak, walk, stand and sit normally.(R. 171.)  He found she was able to stoop, lift, carry, squat, kneel, and crawl.(R. 171.) She could handle objects and travel.  She could comprehend and follow directions.  And, she was able to relate normally to others.(R. 171.)

regarding her mental symptoms and limitations generally credible beginning May 2, 2007 because her limitations and symptoms were supported by the findings of Dr. Benet. (R. 30.)  Dr. Benet performed psychometric testing and concluded that Plaintiff suffered from mood disorder not otherwise specified with depressive features. (R. 30, 270.)  Dr. Benet found that Plaintiff could "perform work-related mental tasks involving understanding and memory, but may have marked difficulty performing tasks involving sustained concentration and persistence, social interaction and adaptation due to depression." (R. 270.)

The ALJ, found Plaintiff capable of performing past relevant work as a waitress in the period prior to May 2, 2007.  (R. 30.)  This finding is supported by the vocational expert's testimony in response to hypothetical two. [22] (R. 344-45.)  However, beginning May 2, 2007, the ALJ found Plaintiff incapable of performing past relevant work and, further, that there were not a significant number of jobs in the national economy that she could perform because "the evidence supports a finding that the claimant has had a substantial loss of ability to meet the demands of basic work related activities on a sustained basis," and the unskilled sedentary occupational base was significantly eroded . (R. 31.)  Beginning May 2, 2007, Plaintiff had the RFC to

lift up to 10 pounds frequently and up to 20 pounds occasionally.  She could sit, stand, or walk for up to 6 hours each in an eight hour workday.  She was to avoid frequent ascending or descending of stairs.  She could perform pushing and pulling activities with her upper and lower extremities.  She could perform activities requiring bilateral manual dexterity for both gross and fine manipulation. She was to avoid hazards in the work places such as unprotected heights and moving machinery.  She could occasionally crouch, stoop, balance, kneel, and crawl.  She could at least understand, remember, and carry out simple job instructions.  She was to avoid frequent, repetitive side to side twisting of her

---

[22]Hypothetical two is based upon the Plaintiff's RFC, as found by the ALJ, prior to May 2, 2007. (R. 28.)

neck.  Due to Claimant's worsening depression and limitations with concentration she is unable perform work activities on a sustained basis.[23]
(R. 30.)

The issues presented in this case concern the extent of Plaintiff's chronic pain and depression and how the ALJ determined May 2, 2007 as the onset date of Plaintiff's disability.  Therefore, the summary of the record evidence, below, will focus upon Plaintiff's chronic pain and depression.

## C. Plaintiff's Medical Evidence

### I. *Physical Impairment Evidence Pre-May 2, 2007*

Plaintiff alleges her chronic pain began in 1998, when she was injured by a co-worker, and progressively worsened. (R. 233, 242, 253.)  Plaintiff was treated by Dr. De Paz[24] and Dr. Springer during the period following this accident and in connection with her Worker's Compensation claim. (R. 305, 317, 331-32.)  In January 1998, an MRI was taken of Plaintiff's thoracic spine, cervical spine and right shoulder to evaluate trauma from this injury. (R. 276.)  All views were negative for trauma. (R. 276.)  A copy furnished to Dr. De Paz stated, "minimal degenerative cervical spondylosis without evidence of focal disc protusion, spinal stenosis, core compression, or nerve compression at any level.  There are minimal degenerative changes at C4-C5, C5-C6,

---

[23] The only difference between the RFC pre-May 2, 2007 and the one  beginning May 2, 2007, is the last sentence, "[d]ue to Claimant's worsening depression and limitations with concentration she is unable to perform work activities on a sustained basis." (R. 28, 30.)

[24] Dr. De Paz is a pain care and rehabilitation medicine physician. (R. 305.)The ALJ notes that Dr. De Paz did not recommend further treatment and evaluation of Plaintiff. (R. 305.) The ALJ observed that Dr. De Paz has a professional reputation for documenting in medical records when he observes something of significance. (R. 305.)  In the instant case, Dr. De Paz did not state there were any neurological problems. (R. 305.) Dr. De Paz assigned Plaintiff a 0 % permanent rating on December 12, 1998. (R. 306.)  Dr. De Paz's December 12, 1998 report also includes the comment that: "I find no objective findings to explain the patient's complaints of pain and dysfunction on physical examination to relate to the amount of pain that the patient describes.  I have nothing more to offer the patient at this time." (R. 308.)

with minimal posterior osteophytic bars."[25] (R. 347-48.)

Additionally, Plaintiff was treated by Dr. Phillip Springer, a psychiatrist and pain specialist after the accident, and until Dr. Springer closed his practice, three years later.[26] (R. 268, 317-18.)  While at the Springer Group, Plaintiff was treated with Methadone and Soma for an adjustment reaction, atypical depressive disorder and major depressive disorder (recurrent, unspecified), neck pain and pain disorder. (R. 268.)  Plaintiff also reported taking Wellburtin, for depression, when she was seeing Frieda Springer for counseling, during her divorce. (R. 268.)

On November 10, 2004, Dr. Lance Chodosh performed an interview and examination of Plaintiff for the Office of Disability Determination. He noted that Plaintiff reported disability secondary to "neck pain, lower and upper extremity weakness/numbness, depression, anxiety." (R. 168.)  He also noted Plaintiff previously had a cervical MRI that showed some degeneration. (R. 168.)  His impression was: "1. Chronic pain and neurologic symptoms with uncertain etiology. There are no significant abnormalities or signs of impairment on physical examination. 2. In my opinion, and based only on objective evidence: [t]he [C]laimant is able to see, hear, and speak normally.  She is able to walk, stand, and sit normally.  She is able to stoop, lift, carry, squat, kneel, and crawl. She is able to handle objects.  She is able to travel.  She is able to comprehend and follow directions, and is able to relate normally to others." (R. 171.)

---

[25]The ALJ read this at the hearing.  This document is not found in the Record.  The ALJ also noted at the hearing that because Dr. De Paz did not order an EMG, the findings of the MRI were not significant. (R. 347-48.)

[26] These records are also not in the record.  The relationship and treatment are mentioned by reference and as background. (R. 306, 317-18, 331.)

Dr. Chodosh also completed an RFC on November 10, 2004.  In his evaluation Dr. Chodosh found that Plaintiff did not have any environmental, communicative, visual, manipulative, or postural limitations. (R. 177-79.)  Dr. Chodosh concluded that Plaintiff occasionally could lift fifty pounds and frequently lift twenty-five pounds. (R. 176.)  She could sit, stand or walk for six hours in an eight-hour work day. (R. 176.)  She was unlimited in her ability to push or pull. (R. 176.)  Dr. Chodosh supported his findings by noting,  "no significant abnormalities or signs of impairment of physical exam." (R. 177.)

On November 10, 2004, a range of motion report was completed for the Office of Disability Determination.  The report disclosed that Plaintiff's range of motion was slightly limited in her cervical and lumbar spine. (R. 172-74.)  The results of the range of motion tests were as follows: In Plaintiff's cervical spine her forward flexion was thirty degrees, left/right (normal range: fifty degrees); her extension was twenty degrees left/right (normal range: sixty degrees); her lateral flexion was forty degrees left/right (normal range: forty-five degrees); her right rotation was fifty degrees and left rotation was sixty degrees (normal range: eighty degrees).Id.  In Plaintiff's lumbar spine, her forward flexion was eighty degrees left/right (normal range: ninety degrees); and her extension and lateral flexion were twenty degrees left/right (normal range: twenty-five degrees). Id.  Plaintiff's shoulder, elbow, wrist, knee, hand, hip, ankle and great toe were all normal. Id.

On February 18, 2005, a Physical RFC Assessment was completed by Nicholas Bancks. (R. 210-17.)  In the Physical RFC Assessment, it was noted that Plaintiff had no postural, manipulative, visual, or communicative limitations. (R. 212-14.)  Further, Plaintiff should avoid concentrated exposure to machinery and heights. (R. 214.)

Plaintiff occasionally could lift fifty pounds and frequently lift twenty-five pounds. (R. 211.)  The RFC assessment further noted that Plaintiff could stand, sit or walk six hours in an eight-hour work day (R. 211) and was unlimited in her ability to push or pull.  Id.

Several times between June 21, 2006 and October 11, 2006, Plaintiff went to Shands Teaching Hospital at the University of Florida for treatment of her neck and back pain.[27]  The doctors at Shands prescribed Percocet and Ultram for Plaintiff's pain. (R. 244, 255.) Impressions included chronic back pain, chronic pain syndrom with acute exacerbation, and cervical radiculopathy. (R. 234, 244, 254.)  Plaintiff was discharged with pain medications and orders to follow up with her primary doctor on back pain and was given a referral to neurology for her cervical radiculopathy .

On June 21, 2006, Plaintiff presented to Shands with neck and back pain, pain in her shoulders and lower extremities. (R. 252-53.)  The muscoskeletal exam revealed mild tenderness over the T-spine between the scapulae, from bilateral upper extremity to bilateral lower extremity; no report of pain with distraction and completely non-focal neuro-muscular exam; and good strength in bilateral upper and lower extremities with distraction. (R. 254.) The final impression was chronic back pain without current adequate pain control. (R. 255.) She was discharged with a prescription for Percocet. (R. 255.)

On September 9, 2006, Plaintiff presented to Shands with chronic neck and back pain, requesting pain medication. (R. 242.)   She reported that her family doctor could no longer manage her pain. Plaintiff was referred to a pain specialist, Dr. Murphy. (R.

---

[27]  There are also progress notes evidencing that Dr. Nilger Malpartida was treating Plaintiff on December 5, 2005 but the notes are generally illegible.  Further, while Dr. Malpartida referred Plaintiff to Dr. Lipnick for pain in her right neck and shoulder (R. 219) there are no records from Dr. Lipnick.

242.)  Plaintiff reports that Dr. Murphy did not give her any pain medications and the anti-inflammatories she was given were of no help. (R. 242.)  Plaintiff reports she did not return to Dr. Murphy because she did not have $100 to spend for "nothing." (R. 242.)  She was given Toradol while at the hospital and her condition upon discharge was improved. (R. 246.) Her muscoskeletal exam revealed sensation and movement intact bilaterally, pain with range of motion tests, no sensory/motor deficits, and negative bilateral straight leg tests. (R. 243, 246.) The final impression was chronic back pain and cervical radiculopathy. (R. 244.)  Plaintiff was discharged with prescriptions for Ultram and Percocet. (R. 244.)  She was instructed to follow up with neurology for her cervical radiculopathy and her primary doctor for her back pain. (R. 244.)

On October 11, 2006, Plaintiff presented to Shands with chronic back and neck pain. (R. 233.)  She went to Shands for treatment because she was about to run out of medication and she was no longer insured.  (R. 233.)  Notably, the progress notes disclose that Plaintiff had full range of motion despite her pain.  The final impression was chronic neck and back pain. (R.  234.)  She was discharged with a prescription for Ultram and instructions for chronic pain syndrome, acute exacerbation. (R. 234.)

### ii.  *Physical Impairment Evidence Beginning May 2, 2007*

On June 4, 2007, Plaintiff went to the Nature Coast Regional Hospital  with neck and back soreness, after being rear-ended in a motor vehicle accident. (R. 277.) There was an immediate onset of numbness. (R. 277.) She was diagnosed with cervical strain, neck pain, and low back pain. (R. 277.) She was given prescriptions for Naprosyn and Skelaxin. (R. 277.)

On June 4, 2007, Plaintiff had images of her cervical and lumbar spine taken. (R. 278.)  The findings on the cervical spine image revealed: straightening of the normal cervical lordosis; mild to moderate disc space narrowing at C4-5 and C5-6; and no fracture. (R. 278.)  The findings on the lumbar spine image revealed: mild disc space narrowing at L5-S1; minimal spondylitic spurring at L4; and no fracture. (R. 278.)

The file also contains a July 10, 2007 Physical RFC questionnaire completed by Dr. Block of Nature Coast Family Health Center. (R. 282.)  Dr. Block's diagnosis was spondylosis. (R. 282.)   Dr. Block noted that Plaintiff's pain is severe enough to interfere with concentration constantly throughout the day. (R. 283.)  Dr. Block further noted that Plaintiff is incapable of even low stress jobs (R. 283) and can only stand or sit for five minutes at a time. (R. 283.)  According to Dr. Block, Plaintiff can only sit or stand well during a normal workday for less than two hours. (R. 284.)  In addition Dr. Block concluded that Plaintiff is required to walk around every fifteen minutes for ten minutes. (R. 284.)  If Plaintiff is sedentary her legs need to be elevated. (R. 284.) Dr. Block concluded that Plaintiff rarely can lift less than ten pounds and can never lift ten pounds or more.(R. 284.)  Plaintiff rarely should look up or down, and she occasionally can turn her head right to left and hold her head in a static position. (R. 285.)  She should never twist, stoop, crouch or climb. (R. 285.)  She is limited in reaching, handling and fingering.  Dr. Block  noted that Plaintiff can only use her fingers and hands 50% of the workday and can never use her arms for reaching. (R. 285.)  According to Dr. Block, Plaintiff's condition is likely to produce good and bad days with more than four bad days a month. (R. 285.)

### iii. *Mental Impairment Evidence Pre-May 2, 2007*

Andres Nazario, Jr., Ph.D., a licensed psychologist, conducted a general clinical evaluation with mental status of Plaintiff on November 9, 2004.  This evaluation was requested by the Office of Disability Determination.  (R. 164.)  Significantly, Dr. Nazario found that Plaintiff "does not report nor manifest any symptoms of a psychological/emotional disorder at the present time," and "does not appear in need of mental health treatment at the present time." (R. 167.)   Dr. Nazario found that "[s]he appears able to concentrate, able to understand and follow directions.  She appears able to interact with others appropriately." (R. 167.)

Dr. Wise, a non-examining state agency medical source, completed a Psychiatric Review Technique on November 16, 2004 noting "[n]o medically determinable impairment."(R. 183.)  The portion of the form entitled "Rating of Functional Limitations is not filled out" presumably because Dr. Wise did not find that Plaintiff had any limitations. (R. 193-94.)  Dr. Wise reviewed Plaintiff's history of pain treatment with the Springer Group and her discharge from the Springer Group with atypical depression and concluded that the condition was "Not Severe." (R. 195.)  Dr. Wise concluded in his report: "[c]urrent CE notes no mental disorder and Plaintiff does not allege mental disorder.  No current MER to support mental illness, no allegation." (R. 195.)

Dr. Zelenka, another non-examining state doctor completed a Psychiatric Review Technique on February 7, 2005. Dr. Zalenka concluded that Plaintiff did not have any medically determinable impairments but that there were coexisting non-mental impairments that needed to be assessed by another medical specialty. (R. 197.)  Again the part of the form for " Rating of Functional Limitations" is not filled out, presumably

because Dr. Zalenka did not find any limitations. (R. 207-08.)  Dr. Zelenka concluded that while Plaintiff may have had some symptoms of depression prior to 2000, her current complaints "do not reflect any diagnosable mental condition and reflect no significant limitations" in functioning due to mental problems. (R. 209.)  In short, he concluded that there was no medically determinable mental impairment. (R. 209.)

### iv.  Mental Impairment Evidence Beginning May 2, 2007

On May 2, 2007, William Benet, Ph.D., completed a psychological evaluation of Plaintiff. (R. 267.)  Dr. Benet completed the evaluation at the request of the Division of Disability Determination. (R. 267.)  He performed the following evaluations: (1) a mental status exam, history & review of records; (2) an assessment of mental functional capacity; and (3) administered the Minnesota Multiphasic Personality Inventory 2.  (R. 267.)   Plaintiff's chief complaint was "Back spasms.  I drop things.  I have short term memory loss." (R. 267.) Dr. Benet noted that Plaintiff was not taking any medication, but that she did use a TENS unit that she purchased herself for pain. (R. 268.)  Dr. Benet noted that Plaintiff's "clinical presentation, history, and psychological test scores suggest a mood disorder with somatoform features." (R. 269.)  Plaintiff obtained a valid 8-2(1) profile on the Minnesota Multiphasic Personality Inventory. Dr. Benet observed,

> [i]ndividuals with similar profiles are often severely depressed.  Some impairment in concentration, memory, thinking, judgment and decision making is likely, as well as chronic feelings of inadequacy or inferiority, which were consistent with [Claimant's] clinical history...[Claimant] should be able to perform work-related mental tasks involving understanding and memory, but may have marked difficulty performing tasks involving sustained concentration and persistence, social interaction and adaptation due to depression.  Improvement may be expected with appropriate psychiatric treatment for mood disorder.

(R. 269-70.)

Dr. Benet also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). He noted that Plaintiff's impairment affects her ability to understand, remember and carry out instructions and that Plaintiff's ability to understand, remember, and carry out short, simple instructions was slightly restricted.(R. 272.) Dr. Benet also found that Plaintiff's ability to understand, remember, and carry out detailed instructions was moderately restricted; her ability to make judgments on simple work-related decisions was moderately restricted; her ability to respond appropriately to supervision, co-workers, and work pressures in a work setting was affected by her impairment; Plaintiff's ability to interact appropriately with supervisors, co-workers, and the public was moderately restricted; and Plaintiff's ability to respond appropriately to changes in a routine work setting and ability to respond appropriately to work pressures in a usual work setting were markedly restricted. (R. 272-73.)

**D. Plaintiff's Daily Activities**

    **I. *Pre-May 2, 2007***

Information concerning Plaintiff's pre-May 2, 2007 daily activities are derived primarily from Plaintiff's October 2004 social security forms and from the November 2004 evaluations by Drs. Nazario and Chodosh. Plaintiff did not require assistance with personal hygiene for any relevant period. (R. 109, 111, 327.)

In 2004, Plaintiff stated she could complete light chores (sweeping, dishes, and laundry) but that her daughters assist her with the heaviest parts. (R. 109, 111, 125, 165.) Plaintiff was able to load the laundry and transfer it to the dryer, but her

daughters remove the laundry and fold it. (R. 109, 11, 125, 126, 127, 165.)  Plaintiff reports she generally divides tasks up, doing a little at a time, resting, and returning to finish later. (R. 165.)  In October 2004, she reported she could shop for groceries with the assistance of her daughters and an electric cart. (R. 109, 111.). Plaintiff also reported, however, that she goes to the store for needed items after the children get on the bus. (R. 125-27.)  In November 2004, she reported she no longer needed the electric cart. (R. 165.)

In October 2004, Plaintiff reported she could prepare simple meals but not big meals, and that her children helped. (R. 109, 111, 125-26.)  However, she also stated she prepared dinner and snacks for the children. (R. 127.)  In November 2004, she reported she was not able to cook, unless it was something fast and/ or something that could be cooked in the crockpot. (R. 165.)

She reported that she cannot drive more than forty-five minutes without her leg going out and experiencing severe pain in neck and back. (R. 112, 125-26.)

In October 2004, Plaintiff reported being able to have conversations with others daily. (R.129.)  However, she reported she no longer attended church or family get-togethers. (R. 130.) In November 2004, Plaintiff reported doing laundry, dishes, making phone calls, taking her kids somewhere every other day, going to the store, getting a quick dinner ready, finishing chores, and visiting family once in a while. (R. 165-66.) She reported that it was hard to socialize but she kept in contact with several people. (R. 166.)  Plaintiff reported she was not able to do yard work. (R. 165.)  She reports having to take many resting breaks in between tasks. (R. 165.) These reported activities are generally consistent with Dr. Chodosh's finding that Plaintiff was  "independent in

activities of daily living." (R. 169.)

### ii. *Beginning May 2, 2007*

Before her injury, Plaintiff reports enjoying "everything" but since her injury she states that pain controls her life. (R. 269, 340.) She reports enjoying listening to the radio, but does not watch much television. (R. 269.) Plaintiff does not go to church because she cannot sit that long. (R. 269.) She sits in the car whenever she goes to her daughter's tennis matches or family gatherings because the seats are too hard and she is more comfortable in the car. (R. 330-31.)

Plaintiff reports she can do light cooking if she sits, otherwise her daughters help her. (R. 209, 328.) She does laundry (R. 328) but cannot wash dishes. (R. 327.) She cannot make her bed.(R. 327.) Plaintiff can bathe, dress, and comb her hair with one hand. (R. 327.) Although Plaintiff's daughters normally run into the store for her she reported she can do the shopping. (R. 209, 314-15.)

## IV. DISCUSSION

Although Plaintiff in her brief only identifies one issue there are actually two issues raised.[28]  First, Plaintiff argues that the ALJ erred by arbitrarily and capriciously selecting May 2, 2007 as Plaintiff's onset date, rather than August 27, 2004, the onset date offered by Plaintiff. Second, Plaintiff suggests that the ALJ erred by ignoring and not relying upon the vocational expert's answer to one of the ALJ's hypothetical questions. The Court will address each issue in turn.

---

[28] There also is an entire section of Plaintiff's brief titled "Understanding Dr. Beatty's Diagnosis" (Doc. 18, pp. 20-30), which as far as the Court can determine has nothing whatsoever to do with this case. The Court was unable to find any records from a Dr. Beatty nor is there any reference in the respective briefs of a Dr. Beatty treating or evaluating Plaintiff. The Court will, therefore, ignore any argument by Plaintiff in this section of her brief.

**A.**     ***Substantial Evidence Supports the ALJ's Conclusion that Plaintiff was not Disabled Prior to May 2, 2007, but Became Disabled on that Date.***

The ALJ concluded that the Plaintiff "was not disabled prior to May 2, 2007, but became disabled on that date and has continued to be disabled through the date of this decision." (R. 23.)  According to Plaintiff, the correct date for the onset of disability is August 27, 2004 and not May 2, 2007. Plaintiff suggests that the ALJ's selection of May 2, 2007 as the date of onset was arbitrary and capricious because "there is no way [Plaintiff's] mental health could have been any different on May 1, 2007, or any other day."

There are two fundamental flaws in Plaintiff's argument. First, Plaintiff completely ignores the fact that the onset date of May 2, 2007 coincides with the date of the May 2, 2007 psychological evaluation of Plaintiff performed by Dr. Benet. Second, when evaluating whether the ALJ erred in determining the onset date, the question is simply whether the onset date selected by the ALJ is supported by substantial evidence and not, as Plaintiff suggests, whether another date could have been chosen. [29]

The ALJ's determination of the appropriate onset date is guided by Social Security Ruling 83-20, which provides in relevant part:

> [f]actors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence . . . In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available . . . The established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.[30]

---

[29] See Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004);  Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).

[30] SSR 83-20.

A review of the medical evidence discloses that Plaintiff's alleged onset date of August 27, 2004  is completely at odds with the medical evidence and opinions detailed in the reports and evaluations performed by Drs. Chodosh and Nazario. On the other hand, the onset date of May 2, 2007 is supported by and consistent with the report and evaluation performed by Dr. Benet.

Plaintiff points to Dr. Chodosh's evaluation and range of motion report and a June 2006 differential diagnosis from Shands teaching hospital as support for her argument that the onset date should be prior to 2007.  Neither of these medical records on closer examination support Plaintiff's argument. Plaintiff's reference to isolated findings in Dr. Chodosh's report completely ignores Dr. Chodosh's conclusion that "there are no significant abnormalities or signs of impairment on physical examination." (R. 171.)  Notably, Dr. Chodosh concluded that Plaintiff was able to perform work activities.[31]

Similarly, the differential diagnosis from a September 2006 visit[32] at Shands was largely unremarkable. Although Plaintiff was experiencing cervical pain during this visit there were no sensory or motor deficits noted and Plaintiff's pain rating was noted as three on a scale of one to ten. (R. 246.) Plaintiff was discharged with prescriptions for Percocet and Ultram and told to follow up with her family doctor for her back pain and given a referral to neurology to evaluate cervical radiculopathy.

---

[31]  Dr. Chodosh found that based on the objective evidence, Plaintiff "is able to see, hear, and speak normally.  She is able to walk, stand, and sit normally.  She is able to stoop, lift, carry, squat, kneel, and crawl.  She is able to handle objects.  She is able to travel.  She is able to comprehend and follow directions, and is able to relate normally to others." (R. 171.)

[32] Plaintiff incorrectly references the Shands visit as a June 2006 visit.

Moreover, Plaintiff's claim that her mental impairments "were no different on May 2, 2007 or any other date" ignores the results of the psychological evaluation performed by Dr. Nazario on November 9, 2004. (R. 164-67.) Contrary to Plaintiff's claim that her mental impairment was no different before 2007, Dr. Nazario in 2004 noted that Plaintiff did not report or exhibit any symptoms of a psychological disorder and concluded that Plaintiff was fully capable of basic mental work activities. (R. 167.) And notably, between 2004 and Dr. Benet's consultative examination in May 2007, there are no records suggesting that Plaintiff sought or received any mental health treatment.

In contrast to this medical evidence - which fails to contain any reference to a serious mental health limitation – Dr. Benet concluded in May 2007 after performing a full psychological evaluation that Plaintiff had marked limitations in her ability to respond appropriately to work pressures and changes in the work setting and marked difficulties performing tasks involving sustained concentration and persistence, social interaction and adaption due to her anxiety and depression (R. 270-73), all of which constitute substantial medical evidence that Plaintiff was unable to engage in basic work activities at that time.

The ALJ properly relied upon Dr. Benet's evaluation in determining that Plaintiff was disabled as of May 2, 2007. Thus, contrary to Plaintiff's suggestion that the ALJ "committed error by randomly picking May 2, 2007 ... as the onset date" there was nothing random about the selection of this date. Rather, the date is supported by substantial evidence. The Commissioner is not required to refute evidence that

another onset date of disability could have been chosen,[33] nor is the Commissioner required to disprove any earlier onset date as long as the Commissioner's determination regarding the onset date is supported by substantial evidence.[34] In this case, the ALJ's determination that May 2, 2007 was the onset date is fully supported by and is entirely consistent with the substantial evidence of record and therefore the ALJ did not err.

**B.**     ***The ALJ Did Not Err in Considering Vocational Expert Testimony in Response to the ALJ's Hypothetical***

Plaintiff's second argument is that the ALJ erred by ignoring the vocational expert's answer to one of the ALJ's hypothetical questions. Although Plaintiff does not develop this argument in her brief, Plaintiff points to the VE's response to a second hypothetical in which the ALJ asked the VE to assume the claimant was required to lie down 3 or 4 times per day for up to 15 minutes at a time. The VE responded that there are no jobs for an individual with that additional limitation.

The problem with Plaintiff's argument is that the ALJ found Plaintiff's complaints regarding the intensity, persistence, and limiting effects of her symptoms were not credible prior to May 2, 2007 because there was a complete lack of medical support for her claims. Simply put, the ALJ did not find that Plaintiff was required to lie down three or four times a day and thus Plaintiff did not have this limitation. Indeed, the ALJ concluded that Plaintiff was disabled as of May 2, 2007 because of her "worsening

---

[33]Blankenship v. Bowen, 874 F.2d 1116, 1121 (6th Cir. 1989).

[34] Besaw v. Sec'y of Health & Hum. Servs., 966 F.2d 1028, 1030 (6th Cir. 1992); see also Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989) ("The question before us is whether the onset date actually chosen is supported by substantial evidence, not whether another date could reasonably have been chosen.").

depression and limitations with concentration" that prevented her from being able to perform work activities on a sustained basis and not from any limitation – either before May 2, 2007 or after May 2, 2007 – requiring Plaintiff to have to lie down on the job for sustained periods of time. Accordingly, there is no merit to Plaintiff's argument that the ALJ committed error by ignoring the testimony of the VE.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida this 4th day of January 2011.


*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge



**NOTICE TO THE PARTIES**
**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**